IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 04-cv-01006-RPM

SPECIAL SITUATIONS FUND III, L.P.;
SPECIAL SITUATIONS CAYMAN FUND, L.P.;
SPECIAL SITUATIONS TECHNOLOGY FUND NEW, L.P., and
SPECIAL SITUATIONS TECHNOLOGY FUND II, L.P., on behalf of themselves and
others similarly situated,

        Plaintiffs,

v.

QUOVADX, INC.,

        Defendant.

---

ORDER DENYING LEAD PLAINTIFFS' SECOND MOTION FOR
PARTIAL SUMMARY JUDGMENT

---

On October 22, 2003, Quovadx issued a press release, announcing an agreement with

Infotech Network Group ("Infotech") for the sale of software to it as a distributor in India and

parts of Africa, in the amount of $7.6 million, the largest sale in the history of Quovadx.  The

company said that it had recognized $4.6 million in revenue from that sale in the third quarter of

2003 and expected the remainder of that revenue over the next four quarters.  Quovadx also

announced that it had entered into a related agreement with Infotech to serve as an "offshore

development partner for Quovadx, supporting Quovadx across research and development

initiatives and professional services engagements."  The announcement said that the agreement

did not establish a minimum outsourcing commitment.

-1-

On the same day, Quovadx publicly reported that it had achieved the highest quarterly revenue in the company's history and that its software license revenue had increased 183% to a record $7.8 million.

With its financial statements in its Form 10-Q for the third quarter, filed on November 3, 2003, Quovadx included the following statement:  "Software license revenue was $7.8 million for the three months ended September 30, 2003, an increase of $5.0 million or 183% from the three months ended September 30, 2002.  The increase in software license revenue was primarily due to a software sale for $4.6 million and continued focus on software sales."

On November 4, 2003, Quovadx announced that it would acquire Rogue Wave Software, Inc. ("Rogue Wave") in a transaction valued at $71 million.  Quovadx would acquire the outstanding stock of Rogue Wave by paying Rogue Wave stockholders $4.09 per share in cash and exchanging 0.5292 shares of Quovadx stock for each share of Rogue Wave stock.

To register the Quovadx stock to be issued in that exchange, Quovadx filed a Form S-4 Registration Statement with the Securities and Exchange Commission on November 12, 2003, and an amended Form S-4 on December 10, 2003.  Both filings included Quovadx's Form 10-Q for the third quarter of 2003.

One of the two contracts with Infotech was the Strategic Partner Outsourcing Agreement, dated September 8, 2003 ("Outsourcing Agreement").  It provided that Infotech would perform outsourcing services on an as-requested basis and that Quovadx would pay Infotech for outsourcing services that were actually performed under the agreement pursuant to Statements of Work.

The other contract was the Distributor Agreement, dated September 8, 2003, and amended on September 25, 2003 ("Distributor Agreement"). The Distributor Agreement provided that Infotech would be the exclusive distributor of Quovadx products in India and certain African countries, and that Quovadx would sell to Infotech software, training, maintenance, and support services for a sum of $7,600,000. The Distributor Agreement required Infotech to establish and fund a letter of credit with an international bank in the amount of $5,460,000 by the end of September 2003 to pay for one software purchase, and to establish and fund a second letter of credit in the amount of $2,140,000 by October 15, 2003, to pay for a second software purchase.

The registration statement for the shares issued for the Rogue Wave acquisition became effective on December 19, 2003, and the exchange of cash and shares was completed.

Quovadx paid $410,000 to Infotech under the Outsourcing Agreement in October, 2003. Infotech's first payment for $5,460,000 in software licenses was not made when due on December 12, 2003. Quovadx was unable to draw upon letters of credit as anticipated because they had not been issued by a bank. A second payment for $2,140,000 in shipments was not made when due on December 25, 2003. On March 10, 2004, Quovadx paid about $2,000,000 to Infotech.

On March 15, 2004, Quovadx publicly announced that it had been unsuccessful in collecting funds from Infotech under the Distributor Agreement and that it had restated its published 2003 third quarter financial results and had revised its previously announced preliminary 2003 fourth-quarter financial results by removing all revenue associated with the shipment of software product to Infotech.

-3-

On or about March 19, 2004, Quovadx's Audit Committee began an inquiry into the circumstances surrounding Quovadx's relationship with Infotech.  On April 12, 2004, Quovadx announced that the SEC was conducting a formal investigation and that the Company's Audit Committee had retained the law firm of Hogan & Hartson L.L.P. to conduct a special review of Quovadx's relationship with Infotech and of the company's disclosures concerning Infotech. That same day Quovadx announced the resignation of its President and Chief Executive Officer, Lorine R. Sweeney, and the resignation of its Executive Vice President and Chief Financial Officer, Gary T. Scherping.

On May 13, 2004, Quovadx issued a press release disclosing the results of its Audit Committee's investigation into the Infotech relationship.  The release stated that the Audit Committee had found the following:

- as of May 13, 2004, Quovadx had not yet received any payment from Infotech under the Distributor Agreement;

- Infotech continued to owe Quovadx approximately $14,100,000 for software that had been shipped to Infotech;

- before entering into the Distributor Agreement, Infotech had not been a software distributor or sold software, and

- it could not be determined that the line of credit purportedly maintained by Infotech at a bank in India exists or has existed, or that such line of credit was secured by liquid assets, or that it was capable of backing the letters of credit to be established by Infotech to secure payment under the Distributor Agreement.

The press release also stated that Quovadx's new management and its advisors had investigated the circumstances surrounding the Outsourcing Agreement and reached the following conclusions:

> [The] outsourcing agreement was likely an inducement to Infotech to enter into the distribution agreement referred to above and also executed on September 8, 2003, and that Infotech would not have entered into the distribution agreement without concurrently entering into the outsourcing agreement. There also appears to have been an additional inducement to Infotech to enter into the distribution agreement in the form of discussions between Infotech and Quovadx's former management regarding a target of an additional $ 10 million in outsourcing services to be purchased by Quovadx from Infotech on an annual basis. There is no legally binding commitment for Quovadx to purchase any such additional outsourcing services. . . .
>
> Quovadx has made payments to Infotech totaling approximately $2.9 million, consisting of a $410,000 payment in October 2003, payments totaling $500,000 in December 2003 and a payment of approximately $2 million in March 2004. These payments were authorized by Quovadx's former management, and were purported to be prepayments to Infotech under the outsourcing agreement. Certain of these payments appear to have been made for the purpose of enabling Infotech to establish the letters of credit required to secure Infotech's payment obligations under the distribution agreement. Infotech has represented to Quovadx that these funds were used to create the necessary infrastructure to accommodate the anticipated increase in outsourcing work from Quovadx to Infotech. Quovadx cannot confirm that the funds were used for these purposes, or that it will receive full benefit from the payment of such funds to Infotech.

(Pls.' Ex. 13).

In their second motion for partial summary judgment, plaintiffs ask that the court determine as a matter of law that Quovadx is liable for damages under Section 11 of the 1933 Securities Act for material omissions in the Registration Statement for the Rogue Wave shares in the failure to disclose the following eight matters:

1.      Quovadx induced Infotech to enter into the Distribution Agreement by
        entering into a contemporaneous Outsourcing Agreement under which
        Quovadx agreed to pay Infotech $2,460,000 for outsourcing services.

2.      Infotech would not have entered into the Distribution Agreement without a
        contemporaneous Outsourcing Agreement.

3.      Quovadx had made a $410,000 payment to Infotech in October 2003,
        purportedly as a "prepayment" under the Outsourcing Agreement, but
        which was actually made to enable Infotech to establish the letters of credit
        required to secure Infotech's payment obligations under the Distribution
        Agreement, and that this "prepayment" was part of a total of $2,900,000 in
        prepayments made to Infotech between October 2003 and March 2004.

4.      Quovadx induced Infotech to execute the Distribution Agreement with a
        pledge to purchase from Infotech an additional $10,000,000 in outsourcing
        services annually from Infotech.

5.      Infotech was an outsourcing agent for Indian companies seeking
        outsourcing work, not a software distributor or seller, and prior to the
        Distribution Agreement, Infotech had no experience distributing or selling
        software.

6.      Quovadx had received no payments from Infotech under any of the
        agreements.

7.      Quovadx could not confirm the existence of Infotech's letter of credit
        purportedly maintained at a bank in India, or that such letter of credit had
        existed.

8.      Quovadx did not expect such letters of credit, or any other credit
        facilities established by Infotech, to be a source of payment by Infotech for
        amounts due under the Distributor Agreement.

(Pls.' br. at 6-7).

        Section 11 of the Securities Act of 1933 imposes strict liability on every person who

signed a registration statement which "contained an untrue statement of a material fact or omitted

to state a material fact required to be stated therein or necessary to make the statements therein

not misleading." 15 U.S.C. 77k(a). Regulation S-K, 17 C.F.R. § 229.10 *et seq.*, sets forth

requirements applicable to the content of Registration Statements.  Item 101, 17 C.F.R.

§229.101, requires a general description of the registrant's business and states that "[t]he name of

any customer and its relationship, if any, with the registrant or its subsidiaries shall be disclosed if

sales to the customer by one or more segments are made in an aggregate amount equal to 10

percent or more of the registrant's consolidated revenues and the loss of such customer would

have a material adverse effect on the registrant and its subsidiaries taken as a whole."

§ 229.101(c)(vii).  Item 303, 17 C.F.R. § 229.303, governs management's discussion and analysis

of financial condition and results of operations.  That provision requires a description of, among

other things, "any unusual or infrequent events or transactions or any significant economic

changes that materially affected the amount of reported income from continuing operations" and

"any known trends or uncertainties that have had or that the registrant reasonably expects will

have a material favorable or unfavorable impact on net sales or revenues or income from

continuing operations."  § 229.303(a)(3)(i) and (ii).

There is no dispute that Quovadx's development of the relationship with Infotech was an

historic event for the company.  The signing of the Distributor Agreement made Infotech

Quovadx's largest customer.  The reported sales to Infotech accounted for more than 20% of

third quarter revenue.

The defendant admits the statement identified as the fifth undisclosed fact.  It also agrees

that the $410,000 paid to Infotech in October was made to assist Infotech in obtaining a letter of

credit but asserts that value was received in services performed as well as for further payments in

December of $500,000.

Quovadx disputes that the purpose of the Outsourcing Agreement was an inducement for the Distributor Agreement and that Infotech would not have entered into the Distributor Agreement without the contemporaneous Outsourcing Agreement.

Quovadx contends that items 6, 7, and 8 were not known facts when the Registration Statement was filed on December 10, 2003.  Infotech's first payment was not yet due and Quovadx contends that it had received assurances from a bank in India that letters of credit would be established in the near future.  It asserts that a delay resulted from a requirement made by First American Bank in Chicago, Illinois, the issuing bank, that an inspection certificate be obtained upon receipt of the software in India and Indian customs officials had not provided it.

There is nothing in the record from former defendants Sweeney and Scherping as to their knowledge and intentions in dealing with Infotech.  Essentially, the plaintiffs are contending that all that was disclosed in the Audit Committee's public statement of the results of the Hogan & Hartson investigation were known to those officers or others when the Registration Statements were signed.  That may ultimately be determined to be true but such speculation cannot serve as a basis for a finding of undisputed facts under Rule 56.

Quovadx's admission that Infotech was an outsourcing agent for Indian companies and that it had no prior experience in distributing or selling software is not, in itself, of such certain materiality as to warrant a factual finding that could not reasonably be contested at trial.

Based on the foregoing, it is

ORDERED the Lead Plaintiffs' motion for partial summary judgment, filed May 26, 2006, is denied.

Dated: November 15, 2006

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge